**UNITES STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: | |
| MARY G. LARSON, | Chapter 7 |
|         DEBTOR. | Case No. 05-20790-WCH |
| STEPHEN E. SHAMBAN, CHAPTER 7 TRUSTEE, | |
|         PLATINIFF, | Adversary Proceeding |
| | No. 06-1381 |
| v. | |
| MARY G. LARSON, | |
|         DEFENDANT. | |
| LLOYD L. HOWELL, JR., Administrator of the Estate of Sherri R. LaMattina-Howell, ANTHONY M. HOWELL, a minor, by Lloyd L. Howell, Jr., his father and next friend, and TIFFANY R. HOWELL, a minor, by Lloyd L. Howell, Jr., her father and next friend, | |
|         PLAINTIFFS, | Adversary Proceeding |
| | No. 06-1446 |
| v. | |
| MARY G. LARSON, | |
|         DEFENDANT. | |

**MEMORANDUM OF DECISION**

**I. INTRODUCTION**

      The matters before the Court are the complaints filed by the Chapter 7 trustee, Stephen E. Shamban (the "Trustee"), and Lloyd L. Howell, Jr. ("Howell") (collectively, the "Plaintiffs"), against Mary G. Larson (the "Debtor"), through which they seek

1

revocation of the Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1), asserting that the Debtor obtained her discharge through fraud by inaccurately listing or omitting certain assets from her Schedules. For the reasons set forth below, I will enter judgment in favor of the Plaintiffs and revoke the Debtor's discharge.

## II. BACKGROUND

The relevant facts are largely stipulated. On September 8, 2002 the Debtor was involved in an automobile accident (the "Accident") that resulted in the death of Howell's wife.[1] Howell subsequently brought a civil suit against the Debtor seeking redress for the Accident (the "Civil Suit").[2] On May 24, 2005, judgment entered in favor of Howell awarding him damages in the sum of $1,000,000.[3]

On October 11, 2006, the Debtor filed a Chapter 7 bankruptcy petition.[4] Pursuant to 11 U.S.C. § 521, the Debtor's petition included a schedule of assets and liabilities, a schedule of income and current expenditures (collectively, the "Schedules"), and a statement of financial affairs (the "Statement of Financial Affairs").[5] The only creditors named in the Debtor's petition were Howell and the Debtor's first mortgagee, whose debt she later reaffirmed, leaving Howell as the only creditor.[6] On Schedule B - Personal Property ("Schedule B"), the Debtor listed her financial interests as: (1) Rockland Federal Credit Union checking account (the "Checking Account") with a market value of

---

[1] Joint Pretrial Statement ("PTS") at 1, Docket No. 10 in 06-01381 and Docket No. 30 in 06-1446.; *In re Larson*, 515 F.3d 325, 327 (1st Cir. 2008).

[2] *See* PTS at 1.

[3] *Id.*

[4] *Id.* at II ¶ 1.

[5] *Id.* at II ¶ 2.

[6] *Id.* at II ¶ 3.

2

$387.58; and (2) Rockland Trust checking account (the "Trust Account") with a market value of $351.37.[7] On Schedule - I Current Income of Individual Debtor(s) ("Schedule I"), the Debtor stated that her current monthly income consisted of $800.00 from social security and trust fund income in the amount of $1,083.33.[8] Item 2 of the Debtor's Statement of Financial Affairs stated that her income for the preceding years, derived from social security and a trust fund, totaled: $22,000.00 for 2003, $22,500.00 for 2004, and $18,833.00 for 2005 up to the date of her petition.[9] By filing the Schedules and Statement of Financial Affairs, the Debtor declared under penalty of perjury that she had read all of the schedules and that they were true and correct to the best of her knowledge, information and belief.[10]

On December 12, 2005, the Debtor appeared at the meeting of creditors held pursuant to 11 U.S.C. § 341 (the "Creditors' Meeting") and was examined by the Trustee.[11] During the examination, the Debtor testified under oath that, consistent with her Schedule I, she received $1,083.00 per month from the Mary Patricia Trust Fund (the "Trust").[12] In the absence of an objection, the Debtor received a discharge from this Court on February 16, 2006.[13]

---

[7] *Id.* at II ¶ 11.

[8] *Id.* at II ¶ 12.

[9] *Id.* at II ¶ 13.

[10] *Id.* at II ¶ 2.

[11] *Id.* at II ¶ 4.

[12] *See* Trial Exhibit 2, Transcript of Creditors' Meeting; *see also*, PTS at II ¶ 5.

[13] PTS at II ¶ 6.

3

On April 18, 2006, in connection with objections to the Debtor's homestead exemption filed by the Plaintiffs, I entered a pre-trial order (the "Pre-trial Order") permitting them to obtain discovery of the Debtor's assets and income.[14] On June 25, 2006, during discovery conducted pursuant to the Pre-trial Order, the Plaintiffs learned, for the first time, that the Debtor misrepresented and/or omitted information on her Schedules, Statement of Financial Affairs, and at the Creditors' Meeting (the "False Statements").[15] Among the False Statements, the Debtor: (1) falsely stated in Schedule B that the balance in the Checking Account was $387.58, when it was $8,551.76; (2) omitted entirely from Schedule I the Alimony that she had been receiving from her former husband since 1989 in the annual sum of $13,000.00; (3) falsely stated in Schedule I, and again during testimony at the Creditors' Meeting, that the amount of monthly income that she received from the Trust was $1,083.33 per month, when it actually was approximately $4,399.80 per month; (4) falsely stated in the Statement of Financial Affairs that her income for 2004 was $22,500.00, when it was actually $71,137.57; and (5) falsely stated in the Statement of Financial Affairs that her income from June to October of 2005 was $18,833.00 when it was actually $59,676.17.[16]

Additionally, the Plaintiffs discovered two letters (the "Letters") that the Debtor had composed and sent to the Trust manager prior to her bankruptcy case. In the first, the Debtor wrote the Trust manager:

> Regarding the December etc 'distribution' please change the beneficiary from myself to son Christopher L. Larson…I would

---

[14] *Id.* at II ¶ 7.

[15] *Id.* at II ¶ 8.

[16] *Id.* at II ¶¶ 15-23.

4

> appreciate your prompt (emphasis in original) attention to change in beneficiaries – as I am being sued for $1,000,000 (resulting from a horrific automobile accident…One other thing – would it be possible to divide the distribution into thirds? Chris will forward the ~~checks~~ monies to me – but a substantial check deposited into his account will really create 'problems' with his tax man. Thank you so much for anything you can do. Gratefully, Mary G Larson.[17]

In the second letter, the Debtor instructed the Trust manager to begin depositing the monthly income payments directly in the Checking Account.[18] In that correspondence, the Debtor wrote:

> Now is the time! So far 'Rockland Federal Credit Union' has not come up in any 'disclosure' etc. Anyway – Chris & Wife Donna Larson are doing the kidney transplant thing on 3/22/04 so this is one less thing for them to think about. Finally out of the deep freeze. Praise the Lord. Sincerely & a 'hug' Mary P G Larson[19]

On June 28, 2006, three days after discovering the False Statements, Howell's attorney informed the Debtor's attorney that the Debtor's petition did not accurately represent the Debtor's income, assets, and financial affairs.[20] On September 12, 2006, nearly a year after filing her original bankruptcy petition, the Debtor amended her schedules to her bankruptcy petition to correct the errors that the Plaintiffs identified.[21]

On October 4, 2006, the Trustee filed a complaint seeking to revoke the Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1). Subsequently, on December 27, 2006, Howell commenced a separate adversary proceeding, filing a substantively identical

---

[17] *See* Trial Exhibit 11, Four Letters between Mary Larson and Deutsche Bank Trust Officer of the Mary Patricia Trust.

[18] *Id.*

[19] *Id.*

[20] *Id.* at II ¶ 9.

[21] *Id.* at II ¶ 10.

5

complaint (collectively, the "Complaints").  The Complaints alleged that the Debtor obtained her discharge by making false statements and a false oath of account in connection with her bankruptcy case, with intent to hinder or defraud the Plaintiffs, and that the Plaintiffs had no knowledge of the false and fraudulent misrepresentations at the time that they were made.  The Debtor answered the Complaints alleging that the identified inaccuracies and omissions in her petition were inadvertent and not made with the intent to hinder, delay or defraud the Plaintiffs.  On June 26, 2007, the two adversary proceedings were consolidated.

On January 28, 2010, I conducted a trial on the Complaints at which time the Debtor testified and sixteen exhibits were introduced into evidence.  At its conclusion, I took the matter under advisement.  Subsequently, the parties filed post-trial briefs.

### III.  POSITION OF THE PARTIES

*The Plaintiffs*

In seeking revocation of the Debtor's discharge, the Plaintiffs argue that the Debtor intentionally made statements that she knew were false while under oath at the Creditors' Meeting, on her Schedules, and on the Statement of Financial Affairs, with the intent to defraud the Plaintiffs.  The Plaintiffs support their argument by offering the communications between the Debtor and the manager of the Trust to demonstrate that the False Statements are part of a pattern of deceit on the part of the Debtor with the intent to fraudulently hide assets from creditors.  The Plaintiffs also argue that they were unaware that the Debtor had made the false statements regarding her assets at the time of her discharge and further assert that if their falsity had been known in time to file a complaint objecting to her discharge would have been denied.

6

*The Debtor*

The Debtor argues that revocation of her discharge is inappropriate because she lacked the requisite mens rea to commit fraud as all of her misstatements were inadvertent. Furthermore, the Debtor argues that her filing of amended schedules and statement of financial affairs upon learning of the errors in the originals removes any fraudulent taint that may be attributed to her original filing. Moreover, the Debtor argues that the Letters are insignificant to showing her intent to hide her assets from creditors because the Trust manager had the discretion to elect the payee of the Trust income. Finally, the Debtor argues, even if her conduct could be characterized as fraudulent, misreporting the income from the Trust and Alimony was immaterial as those sources of income were exempt and hence not property of the estate.

## IV. **DISCUSSION**

Section 727(d)(1) of the Bankruptcy Code provides that "on request of the trustee, a creditor or the Untied States Trustee, and after notice and a hearing, the Court shall revoke a discharge granted under subsection (a) of this section if . . . such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge."[22] "[B]ecause revoking a discharge is an extraordinary remedy, § 727(d) should be construed liberally in favor of the debtor and strictly against those objecting to discharge."[23]

In determining whether to revoke a discharge, the United States Bankruptcy Appellate Panel for the First Circuit has instructed that a court must consider whether:

---

[22] 11 U.S.C. § 727(d)(1).

[23] *Gillis v. Gillis* (*In re Gillis*), 403 B.R. 137, 144 (B.A.P. 1st Cir. 2009)

"(1) the debtor obtained the discharge through fraud; (2) the creditor possessed no knowledge of the debtor's fraud prior to the granting of the discharge; and (3) the fraud, if known, would have resulted in denial of discharge under § 727(a)."[24] To satisfy the first element, the Plaintiffs must show that "the debtor obtained a discharge by committing 'actual fraud' or 'fraud in fact,' such as the intentional failure to schedule an asset of the estate."[25] Similarly, the third element serves to emphasize that in order for a debtor's discharge to be revoked, the debtor must have "committed a fraud 'in fact' which would have barred the discharge had the fraud been known . . . "[26] In this way, the third element subsumes the first to the extent that an analysis of the third element, which in this case is under 11 U.S.C. § 727(a)(4), inherently requires the same analysis of whether the debtor committed fraud in fact.

Because it is undisputed that the Plaintiffs were unaware of the False Statements prior to entry of the Debtor's discharge, the second element of the revocation of discharge analysis is satisfied.[27]

---

[24] *In re Gillis*, 403 B.R. at 144.

[25] *Id.*

[26] *Wilson v. Wilson* (*In re Wilson*), 2002 WL 1067450 *4 (Bankr. D.N.H. 2002) (The court goes on to say, "[I]t is insufficient that a debtor's fraud would have rendered a particular debt nondischargeable; rather, the party seeking revocation must allege that the entire discharge would not have been granted but for the debtor's fraud.")(*citing Lawrence Nat'l Bank v. Edmonds* (*In re Edmonds*), 924 F.2d 176, 180 (10th Cir. 1991)).

[27] PTS II at ¶ 8.

Turning to the first and third elements, 11 U.S.C. § 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless-

\*\*\*

(4) the debtor knowingly and fraudulently, in or in connection with the case-
(A) made a false oath or account . . .[28]

"Under §727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact."[29]

The United States Court of Appeals for the First Ciruit in *In re Tully* explains that the philosophical underpinning of 11 U.S.C. § 727(a) is to:

[M]ake certain that those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs. The statute[] [is] designed to insure that complete, truthful and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. . .'[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.'. . .Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight . . .

\*\*\*

A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so-and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack . . .

\*\*\*

Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if the debtors are not forthcoming.[30]

---

[28] 11 U.S.C. § 727(a)(4)(A).

[29] *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987).

[30] *In re Tully,* 818 F.2d at 110-112 (citations omitted).

9

"Allegations of lying in the filed Schedules and Statement of Affairs, and the 341 Meeting . . . satisfy the requirement of alleging a post-petition fraud."[31] "A debtor's Schedules and Statement of Financial Affairs are unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of a verification under oath."[32] "A false oath may consist of a statement or omission in the debtor's schedules or statement of affairs."[33] "[A]ll that is required for a denial of discharge is a single 'false oath or account.'"[34] "[R]eckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of [11 U.S.C.] § 724(a)(4)(A)."[35] The party moving to revoke a debtor's discharge bears the burden of proving each element by a preponderance of the evidence.[36]

As has been stipulated, the Debtor's False Statements were made on Schedules B, I, the Statement of Financial Affairs, and at the Creditors' Meeting. The Debtor claims that the False Statements were made unintentionally.[37] Nonetheless, the sheer number and significance of the inaccuracies and omissions encompassing the False Statements demonstrates, at the very least, a reckless indifference to the truth- the functional

---

[31] *Richardson v. McCullough* (*In re McCullough*), 259 B.R. 509 (Bankr. D. R.I. 2001) (*cited with approval in In re Gillis,* 403 B.R. at 145).

[32] *Smith v. Grondin* (*In re Grondin*), 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999).

[33] *Gordon v. Mukerjee* (*In re Mukerjee*), 98 B.R. 627, 629 (Bankr. D.N.H. 1989) (*citing Field v. Irving* (*In re Irving*), 27 B.R. 943, 945 (Bankr. E.D.N.Y. 1983)).

[34] *In re Grondin,* 232 B.R. at 277.

[35] *In re Tully,* 818 F.2d at 112.

[36] *See In re Gillis*, 403 B.R. at 144.

[37] *See* Transcript of Trial, Case No. 06-1446, (Doc. 33), page 58.

equivalent to fraud. The False Statements infect every asset-related schedule and statement in the bankruptcy petition so as to completely shed doubt on the Debtor's honesty. Not only did the Debtor grossly underrepresent the value of the Checking Account, her largest liquid asset at the time that she filed her bankruptcy petition, she failed to disclose that she had been receiving Alimony amounting to almost 20% of her annual income, she underrepresented the value of her monthly payments from the Trust by approximately 75% on Schedule I and again at the Creditors' Meeting, and underreported her annual income by almost 70% for the year of and two years preceding the filing of her bankruptcy petition on the Statement of Financial Affairs. Moreover, the communications between the Debtor and the Trust manager demonstrate an apparent long-standing practice of attempting to conceal her assets from her creditors. The Trust manager's discretion is irrelevant because the letters clearly illustrate the Debtor's intention to conceal assets, regardless of what the Trust manager actually did. Under the totality of the circumstances, it is hard to believe that the False Statements were inadvertent.

The Debtor contends that the act of amending her schedules after the Plaintiffs notified her of the False Statements removes their fraudulent taint. She cites *In re Tully* and *In re Tracey*[38] in support of this position. In both cases, the courts cited the debtors' failure to amend their schedules as a consideration in determining the debtors' fraudulent intent.[39] The Debtor erroneously interprets these holdings to stand for the proposition that amending her schedules after the Plaintiffs notified her of the False Statement

---

[38] *Sulllivan, et al. v. Tracey* (*In re Tracey*), 76 B.R. 876 (Bankr.D.Mass. 1987).

[39] *Id.*

ameliorates any fraud she may be responsible for. A debtor's act of amending false statements in her schedules and statement of financial affairs, however, is merely one factor to consider in determining whether she acted fraudulently.[40] In light of the numerous False Statements, the letters between the Debtor and the Trust manager, and the Debtor's failure to amend her schedules until *after* the Plaintiffs had informed her of the misstatements, I am not persuaded that the amendments to the Schedules and Statement of Financial Affairs demonstrate the absence of fraud. Thus, I find that the Debtor knowingly and fraudulently made the False Statements.

With respect to the materiality requirement, "[m]atters are material if pertinent to the discovery of assets, including the history of a bankrupt's financial transactions."[41] Although there is a legal issue as to whether the Trust income and Alimony income were exempt assets and thus not property of the bankruptcy estate, the Debtor's failure to accurately disclose the existence of the Alimony, the value of the Trust income, the value of the Checking Account, and her total annual income was material to the Plaintiffs' investigation of the Debtor's assets, the value of the estate, and the potential return to creditors.[42] Thus, I find that the False Statements were relating to a material fact.

Accordingly, I find that the Debtor obtained her discharge through fraud.

---

[40] *Id.*

[41] *Matter of Mascolo*, 505 F.2d 274, 277 (1st Cir. 1974) (*cited with approval in In re Tully*, 818 F.2d at 110); *See also In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984) (false oath material if subject matter "bears a relationship to the bankrupt's…estate, or concerns the discovery of assets,…or the existence and disposition of his property.").

[42] *See In re Gillis*, 403 B.R. at 145.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order revoking the Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1).

_____
William C. Hillman
United States Bankruptcy Judge

Dated: April 20, 2010